**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBYN E. O'NEILL,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 5:26-CV-135<br><br>MAGISTRATE JUDGE<br>JENNIFER DOWDELL ARMSTRONG<br><br><br>**MEMORANDUM OPINION AND ORDER** |

## I. INTRODUCTION

The Commissioner of Social Security denied Plaintiff Robyn E. O'Neill's application for a period of disability, Disability Insurance Benefits (DIB), and Supplemental Security Income. Ms. O'Neill seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (Consents and Order, ECF No. 5.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's final decision.

## II. PROCEDURAL HISTORY

In February 2024, Ms. O'Neill applied to the Social Security Administration (SSA) seeking a period of disability, DIB benefits, and SSI benefits, claiming that she became disabled on December 31, 2020 (for SSI) and February 8, 2024 (for DIB). (Tr. 220, 242–43.)[1] She identified ten allegedly disabling conditions: (1) fibromyalgia; (2) tachycardia; (3) migraines; (4) scoliosis;

---

[1] The administrative transcript appears at ECF No. 6. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 24"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 1243").

(5) anxiety; (6) obsessive-compulsive disorder; (7) borderline personality disorder; (8) post-traumatic stress disorder; (9) attention-deficit/hyperactivity disorder; and (10) inappropriate sinus tachycardia. (Tr. 278.)

The SSA denied Ms. O'Neill's application initially and upon reconsideration. (Tr. 69, 70, 89, 90.) Ms. O'Neill requested a hearing before an administrative law judge (ALJ). (Tr. 127.) The ALJ held a hearing on March 5, 2025, at which Mr. Brown was represented by counsel and at which she and a vocational expert provided testimony. (Tr. 30–68).

On May 6, 2025, the ALJ issued a written decision finding that Ms. O'Neill was not disabled. (Tr. 11–29.) Ms. O'Neill sought review of the decision with the SSA Appeals Council. (Tr. 215–16.) Her counsel submitted a letter–brief to the Appeals Council. (Tr. 350–51.)

On November 25, 2025, the Appeals Council denied review, rendering the ALJ's decision the Commissioner's final decision in the matter. (Tr. 1.)

Ms. O'Neill filed her Complaint on January 20, 2026, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. O'Neill asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ failed to properly evaluate the stage agency prior administrative medical findings and relied on those findings despite material later neurological and cognitive evidence.
>
> **Second Assignment of Error:** The ALJ found fibromyalgia and chronic pain severe but failed to explain how their functional limitations were reflected in the RFC.
>
> **Third Assignment of Error:** The ALJ found migraines severe but failed to explain why no migraine-related functional limitation was warranted.

(Pl.'s Merits Br. at 11, 18, 21, ECF No. 9, PageID# 1243, 1250, 1253.)

## III. BACKGROUND

### A. Prior Applications for Benefits

Ms. O'Neill has previously applied to the SSA for SSI and DIB, which applications have each been denied before reaching the hearing level. (*See* Tr. 71.)

### B. Personal, Educational, and Vocational Experience

Ms. O'Neill was born in 1995 and was 29 years old on the date of her application. (*E.g.*, Tr. 32, 220.) She earned her GED in 2013. (Tr. 36, 279.) She has work experience in casual dining restaurants and other food preparation businesses, at a gas station, at a department store, and at a retail pharmacy. (Tr. 228–40, 257, 273, 279–80.) She has a driver's license (Tr. 37), and at the time of her application, she had also been driving for a food delivery service. (Tr. 244.) She lives with her boyfriend. (Tr. 37.)

### C. Function Reports

Ms. O'Neill's representative reported to the agency in March 2024 that Ms. O'Neill went to the emergency department twice in 2023 for migraines and low blood pressure. (Tr. 284.) She has to be "very careful standing up from a seated position" so that she does not faint. (*Id.*) She gets overheated easily and feels dizzy and lightheaded. (*Id.*) She has a fibromyalgia flare up once per week, during which she feels like her body is "on fire." (*Id.*) She has migraines two to three times per week, lasting for a few hours and requiring her to lie down and take a nap. (*Id.*) She can walk for one hour before she is in pain. (*Id.*) She suffers from panic attacks "randomly." (*Id.*)

Ms. O'Neill completed a function report in May 2024. (Tr. 285–92.) She reported that she is unable to stand for long periods due to chronic pain, scoliosis, and fibromyalgia. (Tr. 285.) She has "passed out" at work due to POTS, and she has severe anxiety about the idea of going to work. (*Id.*)

On a typical day, Ms. O'Neill will take her medicine, let the dog out and feed him, and then watch television. (Tr. 286.) She will take a nap, after which she will do the dishes or laundry, or sweep if she can. (*Id.*) She watches more television and sometimes takes a second nap. (*Id.*) She goes to bed around 9 p.m. but finds that she does not fall asleep until around 2 a.m. (*Id.*)

Ms. O'Neill wrote that it causes her pain to reach overhead or to bend, which makes it difficult to bathe and shave. (*Id.*) Cooking is sometimes difficult due to back and neck pain. (*Id.*) She makes simple foods daily, and she cooks full meals once or twice a week. (Tr. 287.) She is able to drive and ride in a car, and she is able to go out alone. (Tr. 288.) She shops every two to three weeks, most frequently making online grocery orders for pickup. (*Id.*) She enjoys crocheting, sewing, drawing, reading, walking the dog, and cooking. (Tr. 289.)

Ms. O'Neill identified that she can walk for 50 to 200 yards before needing to rest for ten to twenty minutes. (Tr. 290.) She wrote that her fibromyalgia symptoms can flare, although sometimes they are manageable. (Tr. 292.)

**D. <u>Relevant Hearing Testimony</u>**

***1. Ms. O'Neill's Testimony***

Ms. O'Neill testified at the hearing that for the past five months, she had been working 10 to 15 hours per week as a front desk receptionist at a community organization. (Tr. 38–39.) She does not believe that she would be able to work a job like this full-time, though, because sitting in the same position "get[s] difficult." (Tr. 39.) Additionally, she sometimes wakes up in too much pain to go to work at all. (*Id.*) The part-time work offers her more flexibility to call off or leave work early when needed. (*Id.*) She estimated that she had called off work six times in the previous five months. (*Id.*) She had previously worked a different front-desk job, but she was terminated for absenteeism after having an intestinal infection that caused her to miss several days. (Tr. 39–40.)

Ms. O'Neill testified that her fibromyalgia causes pain primarily in her neck, shoulders, and back. (Tr. 40.) Sometimes, the pain is a dull pain that she can "deal with"; other times, she will wake up and feel that it hurts whenever anything touches her. (*Id.*) Putting on a shirt feels "like sandpaper." (*Id.*) Ms. O'Neill testified that she has tried a number of different muscle relaxers, but she has not been able to find one that really helps. (Tr. 38.) She had been in physical therapy for around a year, and while she had learned some exercises that helped somewhat with her pain, the treatment had not provided a lot of relief. (Tr. 40.) Gabapentin has helped her more than anything, especially with muscle pain, but her nerve pain remains. (Tr. 40–41.) She estimates that, at least once a week, she wakes up and feels like she is "locked up" and cannot function. (Tr. 41.) She has not identified particular triggers for her fibromyalgia pain; it "kind of comes and goes." (*Id.*)

Ms. O'Neill has a constant headache and tension in her neck; sometimes it is barely there and other times she feels like she is being stabbed. (*Id.*) She finds that Excedrin (acetaminophen, aspirin, and caffeine) relieves pressure headaches. (*Id.*) She estimated that she gets migraine headaches two to three times per week. (Tr. 42.) The headaches are accompanied by light sensitivity and, sometimes, nausea. (*Id.*) She was prescribed rimegepant (Nurtec), but she only tried it once because it did not seem to help. (*Id.*)

Ms. O'Neill testified that her bupropion (Wellbutrin) makes her "overheated and sweaty." (Tr. 38.) She gets "hot flashes" around four times a day, with each lasting for around ten minutes. (*Id.*) She had been in counseling until a few months before the hearing, but she stopped because she did not feel that she was getting much from it. (Tr. 42–43.) She feels that the medication is helping her, but she still feels a lot of anxiety in dealing with people. (Tr. 43.) At work, sometimes she needs to "walk away for a minute" to avoid a crowd loudly talking around her. (*Id.*) She also has "little panic attacks out of nowhere," during which she feels as though she cannot breathe and

her mind starts racing. (*Id.*) She estimated she has one such episode per day, lasting for ten minutes. (*Id.*)

With respect to OCD, Ms. O'Neill described that when she gets stressed she begins to feel strongly that she has to "blink a certain way" or do other "little things." (Tr. 44.) With respect to ADHD, Ms. O'Neill testified that she will get up to do something and then forget what she was doing. (Tr. 45.) She writes notes and sets alarms on her phone to remind herself of appointments. (*Id.*) She has a hard time understanding things she reads. (*Id.*)

Ms. O'Neill testified that she takes frequent naps throughout the day. (Tr. 46.) She likes to crochet and, for the past three months, had been slowly painting her living room and doing other small crafts and projects. (*See id.*) She is able to do laundry and load the dishwasher, but she has trouble with bending down and scrubbing. (*Id.*) She is able to go to the store by herself, but she usually does pickup orders now because she gets anxious going inside the store. (Tr. 46–47.) She is able to drive, but she does not like to drive when she is having a migraine because she feels dizzy and has blurred vision sometimes. (*Id.*) Ms. O'Neill sometimes swims at the community organization where she works. (Tr. 47.) She occasionally socializes with her sister, primarily sitting and talking. (*Id.*)

Ms. O'Neill used to go hiking, but it has been a couple years; now she will get outside and walk sometimes but often lacks motivation. (Tr. 47–48.) That said, the ALJ reminded Ms. O'Neill that she traveled with others out of state for a wedding in July 2024 for three or four days and hiked on a mountain. (Tr. 48.)

Ms. O'Neill estimated that she begins to feel pain in her lower back after sitting, standing, or walking for 20 minutes. (Tr. 49.) At work, she will get up and stretch when she feels pain after sitting. (Tr. 49–50.) She usually has no trouble climbing stairs, except on the days that the pain

keeps her in bed. (Tr. 50.) She has trouble crouching and bending, which causes her spine to hurt. (Tr. 51.) The pain is not "awful," but again there are days where she feels in general that she cannot move. (*Id.*) Two to three times a week, she has trouble looking left and right because of neck pain and stiffness. (Tr. 51–52.) She estimates that she sleeps five hours per night, and then she will nap throughout the day. (Tr. 52.) On days where the pain is severe, she occasionally has trouble showering and dressing. (Tr. 52–53.)

### 2. *Vocational Expert's Testimony*

Gail Klier testified as a vocational expert ("VE") at the hearing. (Tr. 30, 59.)

The ALJ asked the VE to imagine a hypothetical worker who was born in 1995 and completed their GED. (Tr. 60.) The person can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. (*Id.*) They can sit for six hours and stand or walk for six hours in a normal workday. (Tr. 60–61.) They cannot climb ladders, ropes, or scaffolds, but they can occasionally climb ramps and stairs. (*Id.*) They can frequently stoop, crouch, and crawl. (*Id.*) They cannot direct the work of others or be responsible for the safety or welfare of others. (*Id.*) They cannot perform work requiring a specific production rate, like assembly line work, or that requires hourly quotas. (*Id.*) They are limited to handling occasional workplace changes in a routine work setting. (*Id.*)

The VE testified that such a person could perform the work of a housekeeping cleaner, marker, or routing clerk. (Tr. 61.)

The ALJ next asked the VE to imagine that the person would be off task for 25 percent of the work day on an ongoing basis. (Tr. 63.) The VE testified that such a limitation would be work preclusive, as employers will tolerate only up to nine percent. (*Id.*) The VE further confirmed that one absence per week on an ongoing basis would be work-preclusive. (Tr. 63–64.)

**E. <u>State Agency Consultants</u>**

A disability examiner (Kim Brink), a physician (Bradley Lewis, M.D.), and a psychologist (Amy S. Johnson, Psy.D.) reviewed Ms. O'Neill's claim at the initial review level in May and June 2024. (Tr. 69–88.)

Dr. Lewis limited Ms. O'Neill to occasionally lifting up to 50 pounds and frequently up to 25 pounds. (Tr. 75.) She can sit and stand for six hours each in an eight-hour workday. (*Id.*) She is limited to frequently climbing ladders, ropes, and scaffolds. (Tr. 76.) She can frequently stoop, crouch, and crawl. (*Id.*)

Dr. Johnson opined on several psychological limitations but ultimately concluded that Ms. O'Neill retained the capacity to complete three- to four-step tasks in a structured and predictable work setting. (Tr. 77.)

Based on these opinions, the consultants determined that Ms. O'Neill retained the ability to perform the work of a housekeeping cleaner, blueprint trimmer, or carder and was not disabled. (Tr. 78–79.)

In a letter explaining the decision to Ms. O'Neill, the agency wrote that the evidence showed that she can still sit, stand, and walk for extended periods of time and lift moderately heavy weight. (Tr. 116.)

In July and August 2024, at the reconsideration level, a different disability examiner (Dustin Atrip), physician (Indira Jasti, M.D.), and psychologist (Kevin Edwards, Ph.D.) reviewed Ms. O'Neill's claim. (Tr. 89–106.)

Dr. Jasti found the initial level findings to be consistent with the medical evidence, and affirmed those findings. (Tr. 103.) Dr. Edwards similarly affirmed the mental residual functional capacity findings from the initial review level. (Tr. 105.)

Based on these opinions, the consultants determined that all the jobs identified at the initial level remained available to Ms. O'Neill, and she is not disabled. (Tr. 106.)

In a letter to Ms. O'Neill explaining that decision, the agency wrote that she may be limited in lifting and carrying some weights but had retained good enough strength, movement, and capacity to do some types of work. (Tr. 121.)

### F. Relevant Medical Evidence[2]

Ms. O'Neill began treating with Gamaliel Batalla, M.D., a pain management doctor, on September 14, 2023. (Tr. 530.) Ms. O'Neill reported that she had experienced generalized body pain since she was fifteen years old, but the pain had been worse in the past year. (*Id.*) The location of the pain varies from day to day. (*Id.*) She had been taking acetaminophen, which provided some relief. (*Id.*)

On examination, Ms. O'Neill walked with a normal gait. (Tr. 532.) There was increased pain on range of motion in the cervical and lumbar spine, and she had diffuse tender points all over her body. (*Id.*) Dr. Batalla assessed that Ms. O'Neill had chronic pain syndrome, fibromyalgia, migraine with aura, and obesity. (Tr. 533.) She was encouraged to remain physically active and exercise. (*Id.*) She was prescribed gabapentin and started on tizanidine as needed for muscle spasms. (*Id.*)

A cervical x-ray image from September 2023 revealed a "slight" reversal of the normal cervical lordosis, which could have been positional or related to spasm. (Tr. 571.) The lumbar image showed slight levoscoliosis centered at the thoracolumbar junction. (*Id.*)

Ms. O'Neill sought treatment at an urgent care clinic in December 2023, complaining of muscle cramps and fatigue. (Tr. 526.) She was diagnosed with dehydration and directed to the

---

[2] Ms. O'Neill focuses her arguments in this appeal on her physical conditions, and therefore the Court limits its summary to that evidence relevant to Ms. O'Neill's physical limitations.

emergency department for fluids and further evaluation. (Tr. 527.) She presented to the emergency department and was treated with fluids before ultimately saying that she felt better and left on her own volition. (*See* Tr. 526.)

At a psychological visit in December of 2023, Ms. O'Neill reported that she had been feeling depressed for the last couple of months but had begun to work as a pharmacy technician (Tr. 361).

In January of 2024, Ms. O'Neill established care with Yara Abuaita, D.O., as her primary care provider (Tr. 521). A physical examination was largely unremarkable, though her body mass index was 37.7. (Tr. 523.)

At a psychological visit in February 2024, Ms. O'Neill reported that she had started working out at a gym with her sister. (Tr. 354.) She had lost her pharmacy job after being "written up multiple times after she spoke up," though she had completed a job interview at a different pharmacy. (*Id.*)

At a March 2024 follow up with Dr. Batalla, Ms. O'Neill said her medication was effective and denied side effects. (Tr. 515.) She rated her current pain as a four out of ten, and she characterized the pain as a stiffness. (Tr. 516.) She said that she had been able to perform activities of daily living. (*Id.*) Dr. Batalla noted that her cervical and lumbar x-ray images were unremarkable. (*Id.*) Ms. O'Neill had not yet started physical therapy. (*Id.*) On examination, Ms. O'Neill walked with a normal gait, but there was again increased pain on range of motion of the cervical and lumbar spine, and she was again noted to have diffuse tender points. (*Id.*) Ms. O'Neill was continued on gabapentin and was started on methocarbamol for muscle spasm. (Tr. 517.) She was encouraged to go to physical therapy. (*Id.*)

At a May 16, 2024 physical therapy evaluation with Yevgeniy Berenshteyn, D.P.T., Ms. O'Neill described generalized pain that is most prominent in the cervical and upper thoracic regions, which interfered with her ability to perform physical activities. (Tr. 702). She said she feels "wobbly" on the stairs. (*Id.*) Dr. Berenshteyn assessed the prognosis with physical therapy as good, and his plan included goals included to increase her leg strength and develop deep neck flexor endurance. (*Id.*)

By June 27, 2024, Ms. O'Neill said she had been swimming at a recreation center. (Tr. 687.) She said that she had not been taking the methocarbamol because it had not been helping. (*Id.*) She rated her pain as between a four and a six, which felt like a dull aching. (Tr. 687–88.) On examination, Ms. O'Neill walked with a normal gait but had spasms noted in the trapezius and paraspinal muscles throughout the back. (Tr. 689.) She had multiple fibromyalgia tender points, but she retained full strength and sensation. (*Id.*) Michael Smith, PA-C, ordered a TENS unit for use on the upper back and lateral flanks two to three times per day for thirty to sixty minutes. (Tr. 689). He encouraged Ms. O'Neill to continue with physical therapy and with swimming. (*Id.*)

At a July 22, 2024 physical therapy session, Ms. O'Neill was noted to be demonstrating improvements in her tolerance to exercises and physical activities. (Tr. 682.) She reported that she had gotten a new job and was swimming nearly every day. (Tr. 683.) She had recently completed a quarter-mile hike "up a mountain." (*Id.*) She had been doing her physical therapy exercises. (*Id.*) On examination, her flexion, abduction, rotation, and other measures in the bilateral upper extremities were rated as almost entirely "4+/5." (Tr. 684.) But she complained of increased pain in the left shoulder. (Tr. 683.)

On August 29, 2024, Ms. O'Neill treated with Kristen Dahlhausen in a virtual appointment, complaining of cognitive changes that she had been noticing for the past ten years. (Tr. 659.) She

said that she was having difficulty with short-term memory and the ability to form sentences. (*Id.*) A Montreal Cognitive Assessment was performed, with Ms. O'Neill scoring 29/30. (*Id.*) Ms. Dahlhausen assessed that progressive degenerative disorder was less likely at this time. (*Id.*) With respect to Ms. O'Neill's complaints of headaches, Ms. Dahlhausen ordered MRI imaging and noted a concern that Ms. O'Neill may have untreated sleep apnea. (*Id.*) Ms. O'Neill described having headaches twice a week that are relieved with Excedrin. (Tr. 662.)

At an appointment with Mr. Smith on November 5, 2024, Ms. O'Neill reported that she had been using the TENS unit on her upper back along the shoulders a few times a week for 30 minutes at a time, and she feels that this has been beneficial. (Tr. 648.) Mr. Smith observed that Ms. O'Neill continued to walk with a normal gait, had negative straight leg raises, and "5/5" strength throughout her body. (Tr. 649.) He noted spasms in the trapezius and paraspinal muscles. (*Id.*) He then added cyclobenzaprine to her regimen. (*Id.*)

On November 20, 2024, Ms. O'Neill underwent a brain MRI. (Tr. 628.) The MRI showed no acute intracranial process or abnormal intracranial enhancement, but documented a partially empty sella, minimally low-lying cerebellar tonsils two millimeters below the foramen magnum, and mild narrowing of the lateral transverse sinuses. (Tr. 629.) The radiologist noted that, while nonspecific, these findings could be seen in the setting of radiographic intracranial hypertension. (*Id.*) Ms. Dahlhausen interpreted these results, writing that the MRI did not reveal findings to suggest the cause of Ms. O'Neill's reported cognitive impairment. (Tr. 630.) Because of the concern for potential intracranial hypertension, Ms. O'Neill was referred for a consultation at a headache clinic. (*Id.*) After being seen, there was "no concern for IIH at this time." (*Id.*)

At a November 21, 2024 virtual appointment at the headache clinic, Ms. O'Neill underwent a Brief Assessment of Cognitive Health (BACH) test. (Tr. 638.) Her performance was validated,

and her scores fell into the range of "probable cognitive impairment" (81.47% probability). (*Id.*) That range corresponds with a recommendation that "specialty evaluation may be warranted." (*Id.*) She was referred for a brain health consultation. (Tr. 640.) On the same day, Ms. O'Neill reported that she had stopped taking topiramate, as it made her feel "irritable and spaced out." (Tr. 641.)

At a neurology follow-up visit in December 2024, Ms. O'Neill reported that she was not getting headaches often. (Tr. 816.) She estimated that she has one migraine headache a week, and more frequently she gets what she believes are tension headaches. (*Id.*) She had not experienced recent issues at work with cognition, but her family had at times pointed out that she seems to struggle putting sentences together. (*Id.*) Her examination at the appointment was essentially normal. (*Id.*) She was referred for formal neurocognitive testing. (Tr. 820.) She declined further daily headache medication. (*Id.*)

On December 31, 2024, Ms. O'Neill underwent a magnetic resonance venography scan of the brain. (Tr. 981.) The MRV showed moderate to high-grade flow-limiting stenosis of the bilateral transverse dural venous sinuses, accentuated by arachnoid granulations, as well as at least moderate focal stenosis of the superior sagittal sinus in the parietal region. (Tr. 983–984, 1069). The report also noted a partially empty sella turcica and low-lying cerebellar tonsils without overt Chiari malformation. (*Id.*). Ms. Dahlhausen explained that narrowing of the venous sinuses could sometimes cause symptoms such as headaches and tinnitus, and Ms. O'Neill was referred to a cerebrovascular clinic for further review and to determine whether additional testing or treatment was needed. (Tr. 1070).

## IV. THE ALJ'S DECISION

The ALJ found that Ms. O'Neill meets the insured status requirements of the Social Security Act through June 30, 2027. (Tr. 17.) The ALJ further found that Ms. O'Neill had not engaged in substantial gainful activity since after the alleged onset date, as her monthly earnings

after that date uniformly fell below the threshold to be considered substantial gainful activity. (*Id.*)

The ALJ next determined that Ms. O'Neill has the following severe impairments: (1) obesity; (2) fibromyalgia; (3) chronic pain syndrome; (4) migraines; (5) scoliosis; (6) bipolar disorder; (7) anxiety disorder; (8) attention-deficit/hyperactivity disorder; and (9) obsessive-compulsive disorder. (*Id.*)

The ALJ found that Ms. O'Neill had non-severe physical impairments of irritable bowel syndrome and a sprain of the left ankle. (*Id.*) The ALJ stated that he considered all of the impairments, including those found non-severe, when developing the RFC. (*Id.*)

The ALJ concluded that none of Ms. O'Neill's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Ms. O'Neill had the residual functional capacity ("RFC") to perform work at the light exertional level with a number of additional limitations. (Tr. 19.) Specifically, Ms. O'Neill can occasionally climb ramps and stairs, but she can never climb ladders, ropes, or scaffolds. (*Id.*) She can frequently stoop, crown, and crawl. (*Id.*) She cannot direct the work of others or be responsible for the safety and welfare of others. (*Id.*) She cannot perform work requiring a specific production rate (like assembly line work) or work that requires hourly quotas. (*Id.*) She is limited to handling occasional workplace changes in a routine work setting. (*Id.*)

The ALJ found that Ms. O'Neill has no past relevant work. (Tr. 22.) The ALJ concluded that she was 28 years old on the alleged disability onset date and had at least a high school education. (*Id.*)

The ALJ then determined that—considering Ms. O'Neill's age, education, work

experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could perform, including work as a "cleaner, housekeeper" (DOT 323.687-014), "marker" (DOT 209.587-034), or "routing clerk" (DOT 222.687-022). (Tr. 23.)

The ALJ therefore found that Ms. O'Neill was not disabled. (Tr. 24.)

## V. LAW & ANALYSIS

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id.* While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B. <u>Standard for Disability</u>**

To establish entitlement to DIB, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims for both DIB and SSI follows a five-step review process. 20 C.F.R. § 404.1520. First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P,

Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent him

from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(g). *See Abbott*, 905 F.2d at 923.

**C. <u>Analysis</u>**

***1. First Assignment of Error – State Agency Medical Consultants***

In her first assignment of error, Ms. O'Neill argues that the ALJ erred by relying on the opinions of the state agency medical consultants when developing the RFC, where the consultants had not reviewed the neurological records from November and December 2024. Ms. O'Neill points out that the consultants would not have reviewed, for instance, the BACH results placing her in the range of "probable cognitive impairment," nor would they have reviewed the MRV results showing sinus stenosis. Ms. O'Neill further argues that the ALJ did not adequately address supportability and consistency when evaluating the consultants' opinions.

The ALJ addressed the prior administrative findings as follows:

> State agency medical and psychological consultants examined the claimant's medical and psychological claims on June 11, 2024, at the initial level, and again on August 6, 2024, at the reconsideration level. The State medical consultants opined that the claimant could perform work at the medium exertional level; could frequently climb ladders, ropes, and scaffolds; and frequently stoop, crouch, and crawl. I find the opinion of these experts in Social Security regulations persuasive. As discussed above, these opinions are consistent with the objective medical evidence and the claimant's history of conservative treatment. Moreover, it is supported by the medical record available to the consultants. The claimant has had relatively unremarkable orthopedic exams and has responded well to medication and physical therapy. I would note, however, that the claimant's subjective complaints and ongoing fibromyalgia would warrant a reduction to the light exertional level, and I thus find this portion of the opinions unpersuasive.

(Tr. 22) (internal citations to the record omitted).

Citing *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp.2d 908 (N.D. Ohio 2008), Ms. O'Neill insists that the November and December 2024 records contain complex medical evidence that should have been interpreted by a medical source before the ALJ came to his decision. She points

to the finding of a partially empty sella, mild narrowing of the transverse sinuses, BACH score of 81.47%, and limiting stenosis of the bilateral transverse venous sinuses. She says, without further explanation, that these findings show a "materially different neurological and cognitive picture than the one reviewed by the State agency consultants." She argues that the RFC should have contained a limitation related to her BACH cognitive result and restrictions "addressing the work related effect of the later MRI/MRV findings or cerebrovascular referral." But she does not identify what specific limitation or restriction would be appropriate, nor does she direct the Court to any medical opinion setting forth a more restrictive limitation.

In *Deskin*, this court announced a rule that "where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated non-examining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." *Deskin*, 605 F.Supp.2d at 911.

Significantly, however, "*Deskin* has not been universally embraced by courts in this district." *Reidenbach v. Comm'r of Soc. Sec.*, No. 5:21-cv-1880, 2022 WL 3043060, at *8 (N.D. Ohio Aug. 2, 2022). Indeed, one court in this district has stated that *Deskin* "is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals." *Henderson v. Comm'r of Soc. Sec.*, No. 1:08 CV 2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010); *see also Berrier v. Comm'r of Soc. Sec.*, No. 3:20 CV 1655, 2022 WL 189855, at *2 (N.D. Ohio Jan. 21, 2022) ("*Deskin* has since been critiqued by other courts in this District."). Moreover, the Sixth Circuit has held that requiring an ALJ to base the RFC determination on a physician's opinion "'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an

abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (quoting SSR 96-5p, 1996 WL 374183 (July 2, 1996)).

In *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011), the court clarified that *Deskin* is "a narrow rule that does not constitute a bright-line test." *Id.* at *2. *Kizys* held that *Deskin* "potentially applies" only where the ALJ "makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence." *Id.*

Following *Kizys*, courts in this district have recognized that "[w]here an ALJ has opinions that account for the majority of the medical evidence, an ALJ may reasonably make judgments on the supportability and consistency of the medical opinions and can adopt residual functional capacity accordingly." *Phelps v. Comm'r of Soc. Sec.*, No. 1:21-CV-02295-BYP, 2022 WL 18395824, at *9 (N.D. Ohio Nov. 15, 2022), *report and recommendation adopted*, 2023 WL 316016 (N.D. Ohio Jan. 18, 2023). Moreover, "an ALJ's RFC determination may be supported by substantial evidence, even if no 'physician offers an opinion consistent with that of the ALJ.'" *Fergus v. Comm'r of Soc. Sec.*, No. 5:20-CV-02612-CEH, 2022 WL 743487, at *9 (N.D. Ohio Mar. 11, 2022) (quoting *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018). Indeed, "[t]he Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence." *Borawski v. Comm'r of Soc. Sec.*, No. 1:20-CV-01091-JDG, 2021 WL 811717, at *18 (N.D. Ohio Mar. 3, 2021).

There will always be some time lapse between the agency's consultants' reports and the ALJ hearing and decision. *See Lunsford v. Comm'r of Soc. Sec.*, No. 3:20cv2665, 2022 WL

2235529, at *2 (N.D. Ohio June 22, 2022); *see also Adams v. Colvin*, No. 1:14CV2097, 2015 WL 4661512, at *16 (N.D. Ohio Aug. 5, 2015) (holding that ALJ did not err in formulating RFC even though approximately ten months had lapsed between medical opinion and ALJ's decision where plaintiff did not demonstrate that subsequent records changed medical evidence to the extent that the medical opinion was outdated).

"[T]he key question is whether the post-opinion evidence was of the type that would *necessitate* a consultative opinion." *Reidenbach*, 2022 WL 3043060 at *8 (emphasis in original); *see also Phillips v. Comm'r of Soc. Sec.*, No. 4:18 CV 00747, 2019 WL 2017765, at *1 (N.D. Ohio May 7, 2019) (framing the question as whether "there are medical findings in the post-November 2014 records that show a worsening of [the plaintiff's] impairment that require evaluation by an acceptable medical source").

Here, the Court is not convinced that the MRI, BACH result, and MRV—even considering that referrals were placed for additional brain health consultations as a result—make up a "critical body" of objective medical evidence, such that the ALJ committed reversible error in crafting an RFC based in part on the agency reviewers' opinions. *Kizys*, 2011 WL 5024866 at *2.

As an initial matter, the reviewing opinions were not "stale"; they were rendered less than six months before the November and December 2024 records. *See Adams*, 2015 WL 4661512, at *16 (ALJ did not err in formulating RFC even though approximately ten months had lapsed between medical opinion and ALJ's decision where plaintiff did not demonstrate that subsequent records changed medical evidence to the extent that the medical opinion was outdated). Moreover, the opinions were based on a review of nearly every medical record in this file. *See Phelps*, 2022 WL 18395824, at *9.

Turning to the records themselves, the Court is not convinced that they are as indicative of a material deterioration as Ms. O'Neill suggests.

With respect to the November 2024 MRI, Ms. Dahlhausen interpreted those results and wrote that they did not reveal findings to suggest a cause for reported cognitive impairment. (Tr. 630.) While they were concerning for intracranial pressure, after further clinical evaluation, intracranial hypertension was ruled out. (*Id.*)

As for the BACH result, while the result led to referrals for additional evaluation, mental status examinations around the time of the result were repeatedly normal. *See, e.g.*, Tr. 627 (in December 2024: "normal level of consciousness, orientation, language, memory, praxis, and higher intellectual function"). It was noted that Ms. O'Neill was not having difficulty driving, was not wandering, was not engaging in dangerous behaviors, and had not experienced issues with cognition at work. (Tr. 626.)

Finally, with respect to the MRV scan, Ms. Dahlhausen explained that narrowing of the venous sinuses could sometimes cause symptoms such as headaches and tinnitus, but around the same time Ms. O'Neill endorsed "not getting headaches often," most frequently tension headaches that are relieved with Excedrin. (Tr. 625–26.) And here, the ALJ explicitly acknowledged the records from November and December 2024 as it relates to the treatment of Ms. O'Neill's headaches, and she points to no inaccuracy in the ALJ's summary.

These circumstances are readily distinguishable from *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009), wherein the ALJ failed to consider nearly 300 pages of treatment notes before relying on the agency consultants' opinions, and where the ALJ used those opinions to reject several treating source opinions rendered after the agency review. *See id.* at 409.

Here, Ms. O'Neill has offered no treating opinions of her own setting forth more restrictive functional limitations. *See also* 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are . . . disabled."); *Lower v. Comm'r of Soc. Sec.*, 2022 WL 1459550, at *9 (N.D. Ohio May 9, 2022) (holding that it is the claimant, not the ALJ, "who has the burden to provide medical evidence showing that she has an impairment, how severe it is, and how it affects her functioning during the time she claims to be disabled"). The ALJ was clearly aware that medical evidence post-dating the agency opinion evidence was in the file, as he cited neurological treatment records from November and December 2024. He also reviewed those records, as he identified Ms. O'Neill's medication changes in December 2024 related to her headaches. *See Minyard v. Berryhill*, 2019 WL 1099552, at *5 (N.D. Ohio Mar. 8, 2019) ("[I]t is clear from the ALJ's discussion of the evidence in the decision that it was known that medical evidence existed that post-dated the opinion evidence and that the ALJ considered the opinion evidence with that evidence in mind.").

While Ms. O'Neill would have liked the ALJ to have specifically addressed those portions of the records that she feels support her position, an ALJ need not discuss every piece of medical evidence in the record. *E.g.*, *Counter v. Comm'r of Soc. Sec.*, No. 1:13 CV 1511, 2014 WL 4300674, at *9 (N.D. Ohio Aug. 29, 2014). The Court is convinced that the ALJ's RFC is supported by substantial evidence and that there is no reason to reverse or remand based on the ALJ's reliance on the state agency medical consultants' opinions.

Before concluding, the Court will briefly address Ms. O'Neill's argument regarding the structure of the ALJ's discussion as it relates to the agency consultants. She argues that the ALJ erred—with respect to both the medical consultants and the psychological consultants—by not discussing each consultant individually and by failing to discuss supportability and consistency.

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how he considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. See 20 C.F.R. § 404.1520c(c)(2). "As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.* No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

Here, the Court agrees with the Commissioner that—while the ALJ's discussion of these factors was not especially robust—the discussion was legally sufficient such that the Court cannot remand.

With respect to supportability, the ALJ noted that the agency consultants' opinions were supported by the medical records available to them. Earlier in the decision, the ALJ had summarized these records, recounting Ms. O'Neill's pain management treatment history, the physical therapy records, and her history of headache treatment. (Tr. 20–21.) The ALJ had also summarized her mental health treatment records (Tr. 21.)

With respect to consistency, the ALJ noted that the opinions were consistent with the medical and other objective evidence in the file. He particularly noted a history of conservative treatment, relatively unremarkable orthopedic exams, and positive response to medication and physical therapy.

After considering these factors, the ALJ then found a portion of the consultants' opinions to be unpersuasive, adopting a *more restrictive* RFC than they had recommended.

In context and reading the decision as a whole and with common sense, *see Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, *8 (N.D. Ohio Sept. 30, 2021), the ALJ adequately set forth his consideration of supportability and consistency to allow the Court to trace his reasoning.

The first assignment of error is overruled.

#### 2. ***Second and Third Assignments of Error – Fibromyalgia, Pain, and Migraines***

The Court will consider Ms. O'Neill's second and third assignments of error together, as they are intertwined. Through them, she argues that the ALJ erred when he found fibromyalgia, chronic pain, and migraines to be severe impairments at Step Two without including a specific

functional limitation in the RFC attributable to these conditions.

As an initial matter, the ALJ *did* include a specific functional limitation attributable to fibromyalgia and chronic pain. He specifically said that he was limiting Ms. O'Neill to work at the light exertional level due to "the claimant's subjective complaints and ongoing fibromyalgia." (Tr. 22.)

Setting that argument aside, the finding of a medically determinable impairment—even a severe one—does not automatically mean that a claimant has resulting functional limitations in their ability to work. *See e.g.*, *Kubas v. Comm'r of Soc. Sec.*, No. 1:22-CV-00856, 2023 WL 4744279, at *8 (N.D. Ohio July 25, 2023) ("The presence of a severe impairment alone does not automatically warrant an RFC limitation if it does not impact a claimant's ability to work."). Further, "a diagnosis alone is not enough to establish specific functional limitations as a matter of right." *E.g.*, *Thornton v. Saul*, No. 4:20-CV-01420-JRA, 2021 WL 3934332, at *11 (N.D. Ohio June 21, 2021), *report and recommendation adopted*, *Thornton v. Comm'r of Soc. Sec.*, No. 4:20CV1420, 2021 WL 4025192 (N.D. Ohio Sept. 2, 2021) (quoting *Teresa F. v. Saul*, No. 1:18-cv-01967-JRS-MPB, 2019 WL 2949910, at *5 n. 7 (S.D. Ind. July 9, 2019); *see also* Social Security Ruling 16–3p, 2016 WL 1119029, at *2 (2016) ("Under our regulations, an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability.")).

Here, Ms. O'Neill argues first that the ALJ failed to adequately consider her fibromyalgia under SSR 12-2p. She suggests that she could have benefitted from a sit/stand option at work and would need a "limitation for reduced endurance," an allowance for pain-related breaks, and a limitation related to absenteeism or time off task. She argues that the longitudinal record support her subjective statements about the intensity of her pain, which she says is severe enough,

frequently enough, to preclude competitive work.

The Commissioner defends the ALJ's decision, pointing out that the ALJ accounted for her pain and fibromyalgia symptoms by limiting her to light work with additional exertional limitations. The Commissioner argues that the ALJ's conclusions and reasoning are supported by substantial evidence.

The Court agrees with the Commissioner.

SSR 12-2p sets out a roadmap for the ALJ in evaluating a claimant's fibromyalgia. 2012 WL 3104869, at *6 (July 25, 2012). SSR 12-2p provides that "[w]idespread pain and other symptoms associated with [fibromyalgia], such as fatigue, may result in exertional limitations" that prevent a person from performing a full range of unskilled work. *Id.* SSR 12-2p also states that people with fibromyalgia "may also have nonexertional physical or mental limitations because of their pain or other symptoms." *Id.*

Among other things, the ALJ must evaluate the claimant's subjective complaints pursuant to the two-step process set forth in SSR 96-7p. First, the ALJ must determine whether the claimant has a medically determinable impairment that can reasonably be expected to produce the claimant's alleged symptoms. *Id.* Second, the ALJ must evaluate the intensity and persistence of the claimant's pain and other symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* SSR 12-2p also provides that, given the distinct characteristics of fibromyalgia, the ALJ must "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" *Id.* at *6.

Importantly, although "the same factors are applied to fibromyalgia as to any [medically determinable impairment], caselaw demonstrates that [t]he nature of fibromyalgia undercuts the efficacy of many of these factors and muddies the legal analysis." *James v. Comm'r of Soc. Sec.*,

No. 1:22-CV-1915, 2023 WL 4172932, at *14 (N.D. Ohio June 5, 2023) (quotations omitted). That is because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007)). "Rather, fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have full range of motion.'" *Id.* (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)).

Moreover, because fibromyalgia presents without objectively alarming signs, cases involving fibromyalgia "place[] a premium on the analysis of subjective symptoms and, for purposes of judicial review, on the ALJ's articulation of the reasons supporting this analysis." *Jones v. Comm'r of Soc. Sec.*, No. 1:21-CV-01309-SO, 2022 WL 3567412, at *10 (N.D. Ohio July 20, 2022), *report and recommendation adopted*, 2022 WL 3566791 (N.D. Ohio Aug. 18, 2022). As the Sixth Circuit has held, "where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007).

Here, the ALJ found fibromyalgia and chronic pain syndrome to be severe impairments at Step Two. (Tr. 17.) The ALJ specifically acknowledged Ms. O'Neill's testimony and subjective statements about her condition, including that she cannot stand for long periods and is limited in her ability to lift, squat, bend, reach, walk, sit, kneel, and climb stairs. (Tr. 20.) The ALJ acknowledged that she said she could not work her job full-time because sitting is difficult, and that there were days when her pain is too great to work. (*Id.*)

The ALJ then carefully explained why he partially discounted Ms. O'Neill's statements. He summarized medical records regarding pain from October 2023 to December 2024. (Tr. 20–

21.) Ms. O'Neill points to no inaccuracy in the ALJ's summary. The ALJ noted that Ms. O'Neill has only required conservative treatment, and the objective evidence has not revealed any underlying condition that would support the level of pain she reports. (Tr. 21.) And while these may not be independent bases, standing alone, to discount fibromyalgia pain, the ALJ did not rely entirely on the lack of objective evidence. The ALJ also looked to Ms. O'Neill's ability to work part-time and her activities of daily living. (Tr. 21.) At various points in the decision, the ALJ called attention to Ms. O'Neill's reports that she remained able to perform simple maintenance, prepare meals, go to doctor's appointments, take medications, shop, and drive. (Tr. 18.) The ALJ pointed to Dr. Batalla's note in March 2024 that Ms. O'Neill was "getting adequate relief" from her regimen. (Tr. 20.) The ALJ noted that by May 2024, Ms. O'Neill reported that she was swimming frequently, and that in July 2024 Ms. O'Neill reported going for a hike. (*Id.*)

The Court is convinced that the ALJ adequately explained how he considered Ms. O'Neill's fibromyalgia and chronic pain, and that his conclusions and limitations are supported by substantial evidence.

Ms. O'Neill next argues that the ALJ failed to adequately consider her migraine headaches. She points out that she continued to report having severe headaches as frequently as daily, with migraines once a week. She says the ALJ failed to evaluate her headache disorder under SSR 19-4p.

SSR 19-4p provides specific guidance on how "primary headache disorders" such as migraines are established and evaluated. *See* SSR 19-4p, 2019 WL 4169635 (Aug. 26, 2019). The ALJ is to consider:

> [a] detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed

> treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *7.

Ms. O'Neill largely relies on her own testimony in support of her argument that these factors weigh in favor of requiring more limitations than those of the RFC. She cites her testimony that she has a daily headache from tension that can be severe enough to feel like stabbing (Tr. 41.) She relies on her statement that she has two to three migraines a week with associated symptoms of light sensitivity and nausea. She refers to her report that she had missed six days of work since starting her job.

The Commissioner defends the ALJ's decision, pointing out that the ALJ accounted for her headaches by limiting her from directing the work of others or being responsible for their safety or welfare, by limiting her to work that does not require a specific production rate, and by limiting her to only occasional workplace changes in a routine work setting.

The Court finds that the ALJ adequately considered Ms. O'Neill's headache disorder and came to a reasonable conclusion on the RFC, one that is supported by substantial evidence.

Ms. O'Neill "does not point to any medical opinion or objective medical evidence to support h[is] argument that h[is] headaches required additional limitations, simply relying on h[is] subjective allegations." *Arthur v. Comm'r of Soc. Sec.*, No. 1:21-CV-00659-JRA, 2022 WL 566546, at *6 (N.D. Ohio Jan. 21, 2022), *report and recommendation adopted*, 2022 WL 562453 (N.D. Ohio Feb. 24, 2022).

The ALJ accurately summarized her testimony and acknowledged her reports about headache frequency. But the ALJ, relying on a longitudinal review of the medical record, found that her statements are not entirely consistent. The ALJ came to this conclusion by considering the SSR 19-4p factors: he considered the reported quality and frequency of her headaches; her adherence to prescribed medication and its efficacy (including noting that her headaches were reportedly relieved with Excedrin in August 2024, that Topamax reportedly made her feel irritable, and that her medication was changed in December 2024); and her activities of daily living, including working part time, hiking, swimming, and driving.

The ALJ's ultimate conclusions are supported by the opinions of the state agency medical consultants.

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("an ALJ is not required to accept a claimant's subjective complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020).

Here, Ms. O'Neill's argument boils down to a request to reweigh the evidence. The Court is convinced that the ALJ's determinations are "reasonable and supported by substantial evidence." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *see also Kurman v. Comm'r of Soc. Sec.*, No. 1:20-cv-01837, 2022 WL 765072, at *3 (N.D. Ohio Mar. 14, 2022) ("The ALJ's

decision . . . must be rooted in the record and must contain specific reasons for the weight given to the [claimant's] symptoms.") (quotations omitted).

The Court finds no material misstatement or inaccuracy in the ALJ's summary of the testimony and medical evidence. *See* 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms . . . ."); 20 C.F.R. § 404.1529(c)(3)(iv)(v); SSR 16-3p, 2017 WL 5180304, at *9 ("[If] the . . . extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, . . . we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."). Ms. O'Neill directs the Court to no records that contradict the ALJ's inherent finding that Ms. O'Neill's headaches were controlled enough on medication such that she could sustain work activity within the relatively restrictive limitations of the RFC. The Court further notes that, as of December 2024, Ms. O'Neill had deferred a daily preventative migraine medicine and was satisfied to continue with an abortive medication for what she described as four migraine headaches per month, along with Robaxin as needed for tension headaches. (Tr. 630.)

In sum, the Court finds that the ALJ's conclusions are supported by relevant evidence that a reasonable mind might accept as adequate to support them. *See Biestek v. Berryhill*, 587 U.S. 97, 102 (2019).

Ms. O'Neill's second and third assignments of error are overruled.

## VI. CONCLUSION

Having overruled Ms. O'Neill's assignments of error for the reasons set forth above, the Court AFFIRMS the Commissioner's final decision.

Dated: November 19, 2026

/s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge